**FILED**
**Apr 26, 2023**
**03:10 PM(CT)**
**TENNESSEE**
**WORKERS' COMPENSATION**
**APPEALS BOARD**



### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Natacha Hudgins | ) Docket No. 2017-01-0690 |
| | ) |
| v. | ) State File No. 92112-2016 |
| | ) |
| Global Personnel Solutions, Inc., et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) |
| Compensation Claims | ) |
| Thomas L. Wyatt, Judge | ) |

---

**Affirmed and Certified as Final**

---

The employee sustained an injury to her right hand and right knee after tripping over a pallet in the course of her employment. The employer accepted the claim as compensable and provided medical benefits, including authorization of a partial knee replacement. After that surgery, the employee began experiencing back and hip pain, prompting a referral for a neurosurgical evaluation that resulted in a recommendation for lumbar surgery. A dispute arose over the employer's authorization of decompression surgery but denial of a recommended fusion, and the employee filed a petition seeking to compel the employer to authorize both procedures and to pay temporary disability benefits for the period of time she alleged she was disabled as a result of her hip and lumbar conditions. Following an expedited hearing, the trial court ordered the employer to authorize the recommended surgery in full and concluded the employee was entitled to temporary disability benefits. On appeal, we affirmed the trial court's interlocutory order. After the surgery was completed, the employer continued to contest the compensability of the spinal conditions. After a compensation hearing, the trial court determined the employee proved by a preponderance of the evidence that her spinal conditions were compensable. It further identified a date of maximum medical improvement it concluded was consistent with the expert medical evidence. The employer has appealed. Having carefully reviewed the record, we affirm the trial court's decision and certify it as final.

Judge Pele I. Godkin delivered the opinion of the Appeals Board in which Judge Meredith B. Weaver joined. Presiding Judge Timothy W. Conner filed a separate concurring opinion.

W. Troy Hart and Tiffany B. Sherrill, Knoxville, Tennessee, for the employer-appellant, Global Personnel Solutions, Inc.

Matthew G. Coleman, Cleveland, Tennessee, for the employee-appellee, Natacha Hudgins

**Factual and Procedural Background**

This is the second appeal in this case. For context, we have set out portions of the factual and procedural background from our earlier opinion following the appeal of the trial court's December 19, 2019 expedited hearing order.

Natacha Hudgins ("Employee") injured her hand and right knee on November 23, 2016, while working at a battery manufacturing plant through a temporary employment agency, Global Personnel Solutions, Inc. ("Employer"). Employer accepted the claim as compensable and provided workers' compensation benefits, including a panel of physicians from which Employee selected Dr. Carl Dyer. Dr. Dyer provided conservative medical treatment before referring Employee to Dr. Martin Redish for a surgical evaluation due to Employee's continuing knee complaints. Employee first saw Dr. Redish on May 11, 2017, at which time he recommended a total right knee replacement. Following utilization review, a partial knee replacement was authorized, and surgery was performed on October 11, 2017.

Employee was taken off work after surgery and continued to follow up with both Dr. Redish and Dr. Dyer. Employee testified that she began experiencing "pain in [her] hip, pain in [her] leg, swelling in [her] feet, [and] numbness in [her] feet" two weeks after her knee surgery. On October 25, Dr. Dyer documented Employee's use of a walker and a "flare-up of the bursitis in [her] right hip subsequent to the surgery." At a November 29 office visit, Dr. Dyer noted Employee's complaints of generalized aches and hip pain, and he observed symptoms of tenderness upon examination.

Both Dr. Dyer and Dr. Redish chronicled Employee's continued use of a walker and persistent hip pain in the following months, and Employee's medical records reflected limited range of motion and tenderness in the right hip, as well as marked atrophy of the right quadriceps muscle. On February 20, 2018, Dr. Dyer noted a "slight flexion contracture" and pain in the right hip that Employee reported resulted from "her having to walk with an alternate gait." In March 2018, Dr. Dyer noted Employee's inability to walk with a "foot over foot type of gait," as well as her limp. In September 2018, Dr. Dyer documented "minimal progress" by Employee and noted she did not walk with a normal gait.

Employee returned to Dr. Dyer on September 27, 2018, with complaints of pain in her lumbar spine and pain radiating into her right hip and leg. An MRI of Employee's lumbar spine revealed "narrowing with

2

osteophytes at L4-L5 with potential compression of the right L5 nerve root and contact with the L4 nerve root bilaterally with compression possibly of the L5-S1 on the right." Dr. Dyer noted, "I feel like this is at the very least an aggravation of a preexisting problem secondary to walking with flexion contracture of the right knee." Dr. Dyer eventually referred Employee to Dr. Adam Caputo for a surgical assessment of her lumbar condition, and Dr. Caputo recommended either a fusion or decompression at L4-L5, depending on the severity of the collapsed interspace. Employer authorized the decompression surgery, but denied the fusion.

Employee filed a request for an expedited hearing, seeking authorization for fusion surgery and payment of temporary disability benefits for the period of time she alleged she was disabled after her knee surgery. Employer asserted the lumbar condition was not work related and questioned the medical necessity of the fusion surgery. Following the expedited hearing, the trial court concluded Employee came forward with sufficient evidence indicating she would likely prevail at trial in establishing that her lumbar and hip conditions are the natural consequence of the gait change brought about by her work-related knee injury. The court ordered Employer to provide whatever treatment Dr. Caputo recommended for Employee's lumbar spine, including surgery, and to pay temporary disability benefits.[1]

On appeal, we affirmed the trial court's interlocutory decision, concluding that "Employee need not show that her back and hip injuries arose primarily out of the employment. Rather, Employee must establish she would likely prevail at trial in showing that her lumbar and hip conditions are the direct and natural consequences of the original compensable knee injury." *Id.* at *6. We noted that Dr. Dyer "directly linked" Employee's flexion contracture of the right knee with an aggravation of a pre-existing condition resulting in Employee's hip, back, and leg problems. *Id.* Moreover, the trial court considered Employee's medical records, Dr. Dyer's causation opinions, and the lay testimony of Employee and her daughter in reaching the conclusion that Employee was likely to establish at trial that the injuries to her hip and back were the direct and natural consequences of the original injury.[2] Thus, we determined the evidence did not preponderate against the trial court's determination.

---

[1] *Hudgins v. Global Personnel Solutions, Inc.*, No. 2017-01-0690, 2020 TN Wrk. Comp. App. Bd. LEXIS 19, at *2-3 (Tenn. Workers' Comp. App. Bd. April 17, 2020).

[2] During the expedited hearing, Employee submitted causation letters from Dr. Dyer. In one response, Dr. Dyer provided an opinion that Employee's spinal condition was work-related. Sometime thereafter, in response to Employer's inquiry as to whether Employee's spinal condition arose primarily from her gait disorder, he replied, "Possibly – the [patient] also has Deg. Disc. Disease."

Following our decision in the first appeal, Dr. Caputo performed spinal fusion surgery in July 2020 and placed Employee at maximum medical improvement ("MMI") for her low back condition on August 4, 2021. Thereafter, Employee returned to Dr. Dyer for continued care. Dr. Dyer referred Employee to Dr. Jason Rogers, who performed a total knee replacement in July 2021 and placed her at MMI on January 6, 2022. Subsequently, Dr. Dyer referred Employee back to Dr. Caputo for further treatment of her spine and also referred Employee to a neurologist to determine whether she had "true motion disorder." Employer did not authorize either referral.

A compensation hearing occurred on December 2, 2022, and Employee introduced into evidence the depositions of Dr. Caputo and Dr. Dyer. Dr. Caputo testified that he had recommended surgical intervention for Employee's back condition in June 2019; however, surgery was not performed until July 2020 due to delays in obtaining approval from Employer's workers' compensation insurance company. He testified that this type of delay was "atypical" and agreed that Employee's condition worsened during this time, noting that "[i]n the case of [Employee], she had a nerve that was being crushed, and the longer that it stays crushed, the less likely it is to recover." When questioned as to causation regarding Employee's low back condition, Dr. Caputo opined, "I did not feel that I could determine causation." He later testified that he could not provide "definite causality for [Employee's] back condition only because I didn't see her until 2019." During cross-examination, Dr. Caputo agreed that factors other than Employee's knee could have resulted in her back symptoms but ultimately testified that "[b]ased on the thorough medical history that I was provided with, including prior records, the only explanation that I have been presented with that plausibly explains her back condition would be the knee."

Dr. Dyer's deposition was taken on August 17, 2022. He testified that Employee did not progress following her partial knee replacement and that she exhibited an "unusual gait pattern which is still present today." Dr. Dyer also confirmed he was referencing Employee's low back and hip in September 2018 when he documented that her condition was "at the very least an aggravation of a pre-existing condition secondary to walking with flexion contracture of the right knee." During cross-examination, when asked if he could say that the back condition was a "direct result" of the work fall, Dr. Dyer responded:

A:    Indirectly through altered gait most likely, plus, you know, she had the injury, and like I said before, she probably had two things happen at one time. The joint problem was the primary symptom that brought her to me in the first place. Then as we sorted through all that business, it became obvious that there were other issues that were impacting on that whole diagnosis and treatment area.

Q:    Okay. So, you would say it indirectly resulted from the fall at work?

A:    Right. Well, indirectly maybe.

4

Q:     Okay.

A:     But, you know, it may have occurred right at the same time. It wasn't manifested as being that much of an issue right when I first saw her because her main focus was on the thing that hurt the most, and that was her knee.

. . . .

Q:     It sounds like you're unsure whether it was directly related to the fall or indirectly. It's hard to say is what I'm gathering?

A:     By virtue of the fact that she had the problem initially, we would have to say that all this was *directly related to the injury* based on the evolution of the whole symptom complex as it evolved over time.

(Emphasis added.) With regard to the lumbar MRI results, Dr. Dyer acknowledged there were degenerative findings but noted Employee "did have the acute problem with the sciatic nerve problem." When questioned about the timeframe for manifestation of Employee's symptoms, Dr. Dyer testified that an acute problem could take a year and a half to become noticeable after a fall, noting

> [i]t could happen that way. Based on the fact that the symptoms are related to the same extremity . . . it's one of degree. The longer you walk with an abnormal gait, the more likely you are to have more back trouble. With a flexion contracture, what happens is the legs become unequal and that causes an increase in pelvic tilt, which when they move, it's tilted and there is extra pressure on one side and the movement of walking makes the pelvis move back and forth with respect to the rest of the body and that, in turn, acts like a grinding action, which would tend to aggravate an issue.

Dr. Dyer conceded that some people have knee injuries and do not develop back symptoms but, when questioned as to whether Employee's back symptoms were the "natural result" of her fall at work, stated

> I don't think you can say whether it's natural or unnatural. I think what you can say is that's the way it turned out to be because of the traumatic nature of her slip and fall injury, which brought her here in the first place. A lot of things happen in a fall.

At trial, Employee also provided unrefuted testimony that she had no problems walking, climbing stairs, lifting pallets, or performing other activities before this work incident and that she first noticed back and radicular pain while in physical therapy for her

knee. Employee also testified that she had no problems with her back and was not under the care of a doctor for back problems or pain management before her work incident. In concluding that Employee proved the compensability of her spinal condition by a preponderance of the evidence, the trial court considered the parties' stipulations, medical proof, including the opinion of Employee's authorized physician, Dr. Dyer, the opinion of Dr. Caputo, and Employee's "credible lay testimony presented during the hearing." The court determined Employee was entitled to an original award of permanent partial disability benefits in the amount of $21,052.71 and determined that Employee reached MMI on January 6, 2022. The court determined that Employer was entitled to a credit for temporary total disability benefits paid after January 6, 2022, in the amount of $9,022.50, which reduced Employee's original award to $12,030.12. It also ordered Employer to provide ongoing medical care with Dr. Dyer and Dr. Caputo, including "promptly authorizing and scheduling Dr. Dyer's referrals to Dr. Caputo and a neurologist." Employer has appealed.

**Standard of Review**

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2022). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2022).

**Analysis**

Employer identified two issues on appeal, which we have restated as follows: (1) whether the trial court erred in deeming Employee's alleged back injury was compensable, and (2) whether the trial court erred in determining the date of MMI for Employee. In support of its position, Employer asserts that "neither of the physicians who testified about [Employee's] symptoms to her back provided an opinion that her symptoms were a direct and natural consequence of her work injury. Further, neither physician was able to provide an opinion to a reasonable degree of medical certainty that her symptoms were primarily work related. . . . As the burden of proof was on the employee, [Employee's] claim for her

6

back injury should have been denied." Employer further asserts that the correct date of MMI was when Employee was released from treatment for her knee on October 9, 2018. Conversely, Employee contends she established by a preponderance of the evidence that her spinal condition was the direct and natural consequence of her right knee injury and that Employer has not shown the trial court erred in that regard. Employee also contends the trial court did not err in determining the date of MMI given that an employee has not reached MMI for legal purposes until the employee is considered to have reached maximum recovery for all compensable conditions.

The employee in a workers' compensation claim has the burden of proving all essential elements of his or her claim for benefits by a preponderance of the evidence. *Scott v. Integrity Staffing Solutions*, No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015). Although an employee may obtain benefits at an expedited hearing on the basis of a "lesser evidentiary standard," i.e., a showing that the employee will likely prevail at a hearing on the merits, the question now is whether Employee's proof is sufficient to establish all essential elements of the case by a preponderance of the evidence. It is undisputed that Employee suffered a compensable injury to her knee after tripping over a pallet at work. Thus, the critical issue on appeal is whether Employee's subsequent spinal condition is compensable as a direct and natural consequence of the compensable knee injury.

*Direct and Natural Consequence Rule*

Employee contends that her back condition is the direct and natural consequence of her compensable knee injury and, therefore, is compensable. The direct and natural consequence rule contemplates that certain injuries may be compensable even if they do not occur while the employee is at work, so long as they are the direct and natural consequence of a compensable injury. We previously determined that the direct and natural consequence rule, which is a judicially-created doctrine, survived the 2013 Workers' Compensation Reform Act, explaining that

> [w]hen the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment. Therefore, 'all the medical consequences and sequelae that flow from the primary injury are compensable'.

*Lee v. Western Plastics*, No. 2016-06-0912, 2016 TN Wrk. Comp. App. Bd. LEXIS 53, at *6-7 (Tenn. Workers' Comp. App. Bd. Oct. 20, 2016) (internal quotation marks omitted) (quoting *Rogers v. Shaw*, 813 S.W.2d 397, 400 (Tenn. 1991)).

Here, Employer asserts Employee failed to carry her burden of proof in demonstrating her back injury arose primarily out of her work injury because neither physician provided an opinion that her symptoms were the "direct and natural

consequence" of the compensable knee injury or provided an opinion to a reasonable degree of medical certainty that her symptoms arose primarily from work. We are not persuaded by this argument. In *Braden v. Mohawk Industries, Inc.*, No. 2019-08-0544, 2022 TN Wrk. Comp. App. Bd. LEXIS 11 (Tenn. Workers' Comp. App. Bd. Mar. 1, 2022), we addressed the parameters of an employee's burden of proof in these circumstances and concluded as follows:

> [A]n employee seeking to prove that a subsequent injury was a direct and natural consequence of the original compensable injury must come forward with evidence supporting a finding that the subsequent injury "flowed from" or was a "natural consequence" of the original injury. In such circumstances, one way an employer can respond is by showing that the actions of the employee leading to the subsequent injury constituted negligence, recklessness, or intentional conduct that broke the chain of causation. Further, we conclude that nothing in the 2013 Workers' Compensation Reform Act expressly abrogated or limited the scope of the direct and natural consequences rule. If this common law rule is to be re-interpreted in light of the Reform Act to require a higher degree of proof from the employee to show a causal link between the original injury and the subsequent injury, it is for our Supreme Court, not us, to address.

*Id.* at *13-14.

Although neither physician used the phrase "direct and natural consequence," we conclude the totality of evidence was sufficient to establish the requisite proof that the spinal condition is compensable. Dr. Dyer is Employee's authorized physician; accordingly, his medical opinion with regard to causation is entitled to a presumption of correctness. Dr. Dyer's medical records provide a detailed history of Employee's right hip pain, use of a walker, gait alteration, atrophy of the right quadriceps muscle, and flexion contracture, all occurring after Employee underwent knee surgery. In addition, in his September 27, 2018 office note, Dr. Dyer opined, "I feel like this is at the very least an aggravation of a preexisting problem secondary to walking with flexion contracture of the right knee." During his deposition, Dr. Dyer clarified that he was referencing Employee's low back and hip complaints when he provided that statement. When questioned as to whether Employee's back condition was directly or indirectly related to the fall, Dr. Dyer replied, "By virtue of the fact that she had the problem initially, we would have to say that all this was *directly related to the injury* based on the evolution of the whole symptom complex as it evolved over time." (Emphasis added.) Although Dr. Caputo said he could not provide a causation opinion for Employee's back condition "only because I didn't see her until 2019," he also testified that "[b]ased on the thorough medical history that I was provided with, including prior records, the only explanation that I have been presented with that plausibly explains her back condition would be the knee." Finally, Employee provided

unrefuted testimony, which the trial court found to be credible, that she had no back symptoms or medical treatment for her back prior to her knee surgery.

In his concurrence, our colleague emphasizes that analysis of the direct and natural consequence rule, post-reform, is a question for the Supreme Court to resolve. We agree. However, he also finds distinctions between the medical testimony of the authorized physician in *Braden* and the testimony of Dr. Dyer. In *Braden*, the authorized physician testified that the employee had healed with no impairment or restrictions but noted there was an increased risk of a peroneal tear due to the way the employee's tendons moved. *Braden*, 2022 TN Wrk. Comp. App. Bd. LEXIS 11, at *12. Similarly, in the present case, Dr. Dyer testified that Employee's pelvic tilt would tend to "aggravate [Employee's back/hip] issue." Furthermore, in *Braden*, the physician testified that it would be difficult to attribute the employee's condition to anything other than what happened at work, based upon what he knew, and, when he was asked by counsel if the "issues that [Employee was] suffering from related to the right ankle are primarily related to the work injury," he responded "[t]hat would be my opinion." *Id.* In the instant case, Dr. Caputo, like the physician in *Braden*, agreed that factors other than Employee's knee could have resulted in her back symptoms but ultimately testified that "[b]ased on the thorough medical history that I was provided with, including prior records, the only explanation that I have been presented with that plausibly explains her back condition would be the knee." Furthermore, Dr. Dyer testified that there was an "indirect" link between the knee injury and the lumbar condition but later testified that Employee's lumbar condition was "directly related to the injury based on the evolution of the whole system complex as it evolved over time." While we agree that the parameters of this rule, post-reform, are questions for the Supreme Court to resolve, we conclude that the facts and medical proof in this appeal, reviewed in their totality, are more similar to those contained in *Braden* than our colleague has concluded.

It is clear that the trial court considered Employee's medical records, Dr. Dyer's causation opinions, Dr. Caputo's testimony, and Employee's testimony in concluding that Employee proved by a preponderance of the evidence that her spinal conditions were compensable. We discern no error and agree that the preponderance of the evidence supports the trial court's decision.

*Maximum Medical Improvement*

Employer's second issue concerns whether the trial court erred in determining Employee did not reach MMI until January 6, 2022. Generally, a person reaches maximum medical improvement when an authorized treating physician determines he or she has recovered as much as is reasonably anticipated. *Guides to the Evaluation of Permanent Impairment*, 6th ed., AMA, at § 2.5e (2008). *See also* Tenn. Code Ann. § 50-6-234(b) ("the determination of attainment of maximum medical improvement . . . shall be made by the physician selected in accordance with § 50-6-204").

9

Dr. Redish performed a partial knee replacement and placed Employee at MMI on October 9, 2018, assigning a twelve percent impairment to the whole body. However, following her surgery and while in physical therapy, Employee developed a gait disorder and began noticing pain in her back and hip. During this time, she also continued to receive medical treatment from Dr. Dyer and Dr. Caputo and was eventually referred to Dr. Jason Rogers, who performed a total knee replacement in July 2021. Dr. Rogers placed Employee at MMI on January 6, 2022, and assigned an impairment of twenty-two percent to the whole body. Throughout this time, Employee was still actively receiving treatment, including surgery, for her work-related conditions. In addition, the trial court ordered continued treatment and authorization of recommended surgery subsequent to the final medical report of Dr. Redish, and Dr. Dyer testified that Employee was not at MMI at the time she received her partial knee replacement. Dr. Dyer also testified that Employee was "better" following her total knee replacement surgery but had not been "fully rehabilitated with respect to her knee replacement." Accordingly, we conclude the evidence does not preponderate against the trial court's determination that Employee did not reach maximum medical improvement until she was released following her total knee replacement. Thus, we conclude the preponderance of the evidence supports the trial court's conclusions with respect to this issue.

**Conclusion**

For the foregoing reasons, we affirm the trial court's order and certify it as final. Costs on appeal are taxed to Employer.



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Natacha Hudgins | ) | Docket No. 2017-01-0690 |
| | ) | |
| v. | ) | State File No. 92112-2016 |
| | ) | |
| Global Personnel Solutions, Inc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Thomas L. Wyatt, Judge | ) | |

---

**Concurrence**

---

Conner, J., concurring.

I agree with the result as stated in the majority opinion. I write separately to emphasize what I view as an unresolved legal issue concerning an employee's burden of proof in circumstances where a subsequent or secondary medical condition develops after a work-related injury that the employee asserts was a direct and natural consequence of the compensable work injury.

As we noted in *Braden v. Mohawk Industries, Inc.*, No. 2019-08-0544, 2022 TN Wrk. Comp. App. Bd. LEXIS 11 (Tenn. Workers' Comp. App. Bd. Mar. 1, 2022), the "direct and natural consequences" rule is a judicially-created doctrine that places responsibility on an employer for "all the medical consequences and sequelae that flow from the primary injury." *Id.* at *8 (quoting 1 A. Larson, *The Law of Workmen's Compensation* § 13.11 (1990)). Thus, in circumstances where an employee suffers a compensable injury, then later develops a new and distinct medical condition that was the "direct and natural result" of the work injury, that subsequent condition will be deemed compensable. *See, e.g.*, *Rogers v. Shaw*, 813 S.W.2d 397, 399 (Tenn. 1991) ("every natural consequence that flows from the [work-related condition] arises out of the employment").

The difficulty arises in determining how this common law doctrine applies in light of the 2013 Workers' Compensation Reform Act. As a result of amendments to the statutory definition of "injury" included in the Reform Act, it is no longer sufficient for an employee to prove merely that an injury "arose out of" the employment. Instead, the employee must prove by a preponderance of the evidence that the injury arose "*primarily* out of and in the course and scope of employment," which requires evidence that "the

1

employment contributed more than fifty percent (50%) in causing the injury, considering all causes." Tenn. Code Ann. § 50-6-102(12)(B) (2022) (emphasis added). However, it remains unclear how the addition of the word "primarily" as noted above impacted the direct and natural consequences rule, if at all. For example, if expert medical evidence supports a finding that a work-related injury contributed to, but was not the primary cause of, a subsequent medical condition, it is unclear whether that employee has met his or her burden of proving that the subsequent medical condition "flowed naturally from" or was a "direct and natural consequence" of the compensable work injury given the higher burden of proof placed on employees as a result of the Reform Act.

Moreover, prior to the passage of the Reform Act, the Tennessee Supreme Court made clear that "[a]ll reasonable doubts as to causation of an injury should be resolved in favor of the employee." *Patterson v. Thyssenkrupp Elev. Co.*, No. W2012-01619-WC-R3-WC, 2013 Tenn. LEXIS 496, at *10 (Tenn. Workers' Comp. Panel June 10, 2013) (citing *Phillips v. A&H Constr. Co.*, 134 S.W.3d 145, 150 (Tenn. 2004). Yet, as part of the Reform Act, the General Assembly mandated a different statutory construction, stating that "this chapter shall not be remedially or liberally construed, but shall be construed fairly, impartially, and in accordance with basic principles of statutory construction." Tenn. Code Ann. § 50-6-116. Further, the General Assembly made clear that "this chapter shall not be construed in a manner favoring either the employee or the employer." *Id.* Therefore, in my opinion, it is no longer appropriate to resolve any reasonable doubt regarding medical causation in favor of the employee when applying the direct and natural consequences rule. *See, e.g.*, *Willis v. All Staff*, No. M2016-01143-SC-R3-WC, 2017 Tenn. LEXIS 455, at *11-12 (Tenn. Workers' Comp Panel Aug. 3, 2017) ("Employee's argument . . . that all reasonable doubts concerning causation should be resolved in his favor is without merit . . . . [D]ecisions enunciating this standard ha[ve] been replaced by the statutory language quoted above.").

In *Braden*, the treating physician testified that the subsequent medical condition was "primarily related to" the work injury. *Braden*, 2022 TN Wrk. Comp. App. Bd. LEXIS 11, at *12. Thus, while acknowledging that the expert medical evidence was "confusing and muddled at times," we concluded the employee's proof in that case was sufficient to support the compensability of the subsequent condition as a direct and natural consequence of the work injury. *Id.* at *14. Here, in my opinion, the proof in support of application of the direct and natural consequences rule is weaker than it was in *Braden*. Dr. Dyer is the only expert to directly address the issue. After commenting multiple times during his deposition that there was an "indirect" link between the knee injury and the lumbar condition, he finally testified that the lumbar condition was "directly related to the injury based on the evolution of the whole system complex as it evolved over time." Given that Employer offered no expert proof to rebut this statement, I conclude Dr. Dyer's testimony that the lumbar condition was "directly related" to the compensable knee injury was just sufficient to support application of the direct and natural consequences rule.



| Natacha Hudgins | ) | Docket No. 2017-01-0690 |
| | ) | |
| v. | ) | State File No. 92112-2016 |
| | ) | |
| Global Personnel Solutions, Inc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Thomas L. Wyatt, Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 26th day of April, 2023.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|------|----------------|------------------|---------|-----------|----------|
| Tiffany B. Sherrill | | | | X | tbsherrill@mijs.com wth@mijs.com clalmeida@mijs.com |
| Matthew G. Coleman | | | | X | mcoleman@loganthompsonlaw.com lhaywood@loganthompsonlaw.com |
| Thomas L. Wyatt, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |

Matthew Keene
Acting Deputy Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-532-1564
Electronic Mail: WCAppeals.Clerk@tn.gov